IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

DONTRE MITCHELL,

*Defendant*.

Criminal Action No. ELH-19-0482

**MEMORANDUM OPINION**

Defendant Dontre Mitchell is currently serving a 54-month sentence at FCI Cumberland for a conviction under 18 U.S.C. § 922(g).  Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Mr. Mitchell has filed a pro se motion for compassionate release based on his purported vulnerability to COVID-19.  *See* ECF 32 (the "Motion").[1]  It is supported by one exhibit.  ECF 32-1.  The government opposes the Motion (ECF 37), supported by four exhibits.  See ECF 39; ECF 39-1; ECF 39-2; ECF 39-3.  Mitchell has not replied and the time to do so has expired.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion, without prejudice.

**I. Factual Background**

On October 10, 2019, a federal grand jury returned a single-count indictment against Mr. Mitchell, charging him with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1).  ECF 1 (the "Indictment").  According to the Indictment, on June 9, 2019, defendant unlawfully "possessed a firearm and ammunition, to wit, a Smith & Wesson 9 mm Luger pistol"; "nine (9) G.F.L. 9mm Luger FMJ cartridges"; and "six (6) CCI 9mm Luger FMJ

---

[1] On March 19, 2021, the Office of the Federal Public Defender ("FPD") advised that it would not be supplementing the Motion.  ECF 34.  However, on April 7, 2021, the FPD provided the Court with documentation regarding Mr. Mitchell's exhaustion of his administrative remedies. *See* ECF 35-1.

cartridges[.]"  ECF 1 at 1.

Defendant entered a plea of guilty to the charge set forth in the Indictment on March 4, 2020 (ECF 13), pursuant to a plea agreement.  ECF 14 (the "Plea Agreement").  The plea was tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C).  *Id.* ¶ 10.  The Plea Agreement contemplated a base offense level of 24.  *Id.* at ¶ 6(a).  After taking into account three deductions for Mr. Mitchell's acceptance of responsibility, in accordance with § 3E1.1 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the parties contemplated a final offense level of 21. *Id.* ¶¶ 6(b), (c).  There was no agreement as to defendant's criminal history.  *Id.* ¶ 7.  However, the parties agreed to a sentence ranging from 48 to 72 months of imprisonment as the appropriate disposition of this case.  *Id.* ¶ 10.

The Plea Agreement also included a stipulation of facts.  *Id.* at 10.  According to the stipulation, on June 9, 2019, "Baltimore Police officers received information from a confidential informant (CI) that there was an armed individual participating in a gambling game in the area of E. 26th Street and Greenmount Avenue."  *Id.*  Further, the CI indicated that the "individual [was] wearing a white shirt and gray sweatpants, with a long, blown out, natural hairstyle."  *Id.*  "Acting on this information, BPD officers responded to the area of Greenmount Ave and E. 26th Street, where they observed a group of individuals."  *Id.*

At that time, "some of the males fled the area on foot."  *Id.*  But, "Dontre Mitchell, who was wearing a white shirt and gray sweatpants, advised others not to run."  *Id.* The officers then approached defendant, and he "began running northbound in the 2500 block of Greenmount Avenue."  *Id.*  At this point, "an officer observed Mr. Mitchell complete a 'security check'– gesturing his hand toward his waistband and grabbing it while running . . . ."  *Id.*

Thereafter, the officers apprehended Mr. Mitchell.  *Id.*  He "denied possessing any items

while grabbing toward his waist." ECF 14 at 10. But, the officers recovered "a Smith & Wesson 9mm Luger pistol" from the defendant's "waistband area," which was "loaded with fifteen rounds" of ammunition. *Id.* "Neither the firearm nor ammunition was manufactured in the State of Maryland." *Id.*

Sentencing was held on June 25, 2020. ECF 26.[2] According to the Amended Presentence Report (ECF 29, "PSR"), defendant was twenty-nine years old at the time of sentencing. ECF 29 at 3.[3] He had neither a high school diploma nor a GED. *Id.*

In anticipation of sentencing, the FPD prepared a memorandum advising the Court, in pertinent part, that the parties had "agreed that a 54-month (4 ½-year) sentence [was] appropriate in this case . . . ." ECF 21 at 1. The memorandum was accompanied by five letters prepared by members of defendant's family. *See* ECF 21-1 through ECF 21-5. Characterized broadly, these letters expressed the support of defendant's family members for Mr. Mitchell and stressed the difficulties Mr. Mitchell had experienced as a minor. *See*, *e.g.*, ECF 21-1 at 1-2.

The PSR reflected that on three previous occasions, defendant had been convicted of drug-related offenses in the Circuit Court for Baltimore City. *See* ECF 29, ¶¶ 27-29. Specifically, in March 2010, defendant was convicted of distribution of controlled dangerous substances. *Id.* ¶ 27. As a result, he was sentenced to three years' incarceration, nearly all of which was suspended, as well as a three-year term of supervised probation. *Id.*

Mr. Mitchell was arrested approximately three months later, on June 8, 2010, for the

---

[2] Sentencing was held via videoconference. *See* ECF 26; *see also* ECF 21 at 1 (indicating that, based on the parties' agreement to recommend a sentence of 54 months' incarceration, Mr. Mitchell had "waive[d] his right to an in-person hearing and agree[d] to proceed with sentencing via videoconferencing").

[3] An initial version of the PSR was docketed on May 8, 2020. ECF 19. It was subsequently amended on June 26, 2020. ECF 29.

unlawful possession of controlled dangerous substances.  ECF 29, ¶ 28.  Approximately eight months later, on February 14, 2011, defendant was convicted and sentenced to three months' imprisonment.  *Id.*

About one year later, on February 27, 2012, defendant was arrested once again.  *Id.* ¶ 29.  And, on July 15, 2013, he was convicted of distribution of controlled dangerous substances and possession with the intent to distribute controlled dangerous substances.  *Id.*  Mr. Mitchell was sentenced to concurrent terms of five years' imprisonment.  *Id.*

On February 7, 2014, Mr. Mitchell was found guilty of violating the terms of his probation with respect to the March 2010 conviction, and his probation was revoked.  *Id.* ¶ 27.  Accordingly, defendant was sentenced to approximately three years' incarceration, consecutive to his sentences for the February 2012 convictions.  *Id.*  Ultimately, Mr. Mitchell was paroled on June 5, 2015.  *Id.* ¶ 29.  His term of parole was scheduled to expire in 2020.  *Id.*

Given defendant's prior convictions, Mr. Mitchell had a subtotal criminal history score of eight points.  *Id.* ¶ 30.  But, Mr. Mitchell "committed the instant offense" on June 9, 2019, "while under a criminal justice sentence" in connection with the March 2010 conviction and the February 2012 convictions.  *Id.* ¶ 31.  Thus, in accordance with U.S.S.G. § 4A1.1(d), defendant's criminal history score was increased by two points, establishing a total criminal history score of ten points and a criminal history category of V.  *Id.* ¶¶ 31-32.  Given defendant's criminal history category, coupled with a final offense level of 21, the Guidelines contemplated a sentence ranging between 70 and 87 months of imprisonment.  *Id.* ¶ 78.

The Court sentenced defendant to 54 months of imprisonment, with credit for time served since June 9, 2019.  ECF 27 at 2.  As mentioned, Mr. Mitchell is currently serving his sentence in FCI Cumberland.  He has a projected release date of April 9, 2023.  *See Inmate Locator*, Bureau

of Prisons, https://www.bop.gov/inmateloc/ (last visited July 20, 2022).

On January 8, 2021, defendant submitted a request for compassionate release to the Warden of FCI Cumberland.  ECF 32-1 at 2.  The Warden did not respond within thirty days.  Accordingly, on February 8, 2021, defendant filed the Motion with this Court.  ECF 32.  Approximately one week later, on February 16, 2021, the Warden denied defendant's request.  *See* ECF 35-1 at 4; ECF 39-1 at 2 (same).

In the Motion, Mr. Mitchell seeks release "due to danger from the Corona Virus [sic]." ECF 32 at 1.  He "submits the Court should consider the extraordinary circumstances in which the Defendant found himself as a result of the COVID19 pandemic & his status of higher risk."  *Id.* Notably, however, Mr. Mitchell does not specify any underlying medical conditions that may warrant a finding that he is at "higher risk" of severe illness due to COVID-19.  *See id.* at 1-3.

The government has submitted a copy of defendant's medical records.  ECF 39-2; ECF 39-3.  The most up-to-date information indicates that, as of February 11, 2021, Mr. Mitchell weighs 175.8 pounds.  ECF 39-3 at 2.  Other records show that defendant stands 5'9" tall.  ECF 39-2 at 18; ECF 29, ¶ 53.  Thus, according to the most recent information made available to the Court, Mitchell has a body mass index ("BMI") of 25.8. *See Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult bmi/english bmi calculator/bmi calculator.html (last accessed July 20, 2022).  Moreover, defendant's medical records indicate that on April 21, 2021, he refused to be vaccinated against COVID-19.  ECF 39-3 at 8.[4]

---

[4] The parties have not advised the Court as to whether there is any change in defendant's vaccination status.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."
18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United
States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492,
495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of
finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526
(2011). One such exception is when the modification is "expressly permitted by statute." 18
U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i)
provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling
reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194.
This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th
162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it
permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L.
No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had
to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x
862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1
(E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute
discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on
an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on
Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66

(2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S.

___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[5] In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the

_____

[5] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled **Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider

any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  But,

even if the defendant establishes an extraordinary and compelling reason that renders him eligible

for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine

whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560

U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States

v. Jones*, No. 22-6071, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that

"a court need not explicitly make findings on extraordinary and compelling reasons where

consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, No. 21-

6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district

court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to

the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district

court must consider § 3553(a) factors when considering a motion to reduce sentence under

§ 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United

States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when

considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the

sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d

691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors);

*United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court

must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and

compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted);

*see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v.

United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94;

*United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted). And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.     COVID-19[6]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7] COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

---

[6] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of July 20, 2022, COVID-19 has infected approximately 88.8 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed July 20, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In May 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[8] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 30% of people from

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 92% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited July 20, 2022).

Moreover, approximately 107 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated June 13, 2022). And, federal regulators approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*,

WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See*, *e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined. *See*, *e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Nevertheless, that respite did not last long. We soon experienced another surge in COVID-19 cases. *See*, *e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. A new subvariant of the virus began "spreading

rapidly" and soon became "the dominant form of the virus . . . ."  *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.  As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," is "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.  And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter . . . ."  Amelia Nirenberg, *A Coming Fall Surge?*,  N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating

to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[9]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[9] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of July 20, 2022, the BOP had 140,439 federal inmates in BOP-managed institutions and approximately 36,000 staff. And, by that date, the BOP had administered 324,597 vaccine doses to staff and inmates. *See* Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed July 20, 2022).

As of July 20, 2022, the BOP reported that 483 federal inmates, out of a total population of 140,439, and 426 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19. Moreover, 49,757 inmates and 13,238 staff have recovered from the COVID-19 virus. In addition, 301 inmates and seven staff members have died from the virus. The BOP has completed over 1 million COVID-19 tests for more than 200,000 inmates since testing began. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Cumberland, the BOP reported that as of July 20, 2022, out of a total of 1,278 inmates, four inmates and three staff members have tested positive. No inmate in FCI Cumberland has died of COVID-19, and 360 inmates and 133 staff members have recovered at the facility. In addition, 250 staff members and 1,197 inmates in FCI Cumberland have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/cum/ (last visited July 20, 2022).

## IV.    Discussion

In the Motion, defendant asks the Court to grant him relief in light of the "extraordinary circumstances" posed by COVID-19 and "his status of higher risk[.]" ECF 32 at 1. Mr. Mitchell

also maintains that the protocols enacted by the BOP are insufficient to guard against the risk that he could contract COVID-19 while incarcerated. ECF 32 at 1-2. On the other hand, he stresses that BOP has implemented numerous restrictions that have effectively precluded him from obtaining "adequate timely access to the appropriate staff & mediums to follow the remedy procedures." *Id.* at 1.

The government urges the Court to deny the Motion, claiming that defendant has failed to establish an extraordinary and compelling reason that warrants his release from prison. ECF 37. Specifically, the government asserts that defendant has no COVID-19 risk factors and, moreover, in April 2021, he refused to be vaccinated against COVID-19. ECF 37 at 15. Further, in the government's view, "Mr. Mitchell's fear of contracting the novel coronavirus while incarcerated, without more, is not sufficient reason for granting compassionate release." *Id.*

In the alternative, the government maintains that the sentencing factors outlined in 18 U.S.C. § 3553(a) preclude the Court from awarding Mitchell the relief that he seeks. *Id.* at 20-22. To that end, the government argues that defendant's numerous prior drug offenses are of concern. *Id.* at 21. Moreover, the government points out that defendant's sentence "fell more than a year below the Guidelines range" and "was imposed during the COVID-19 pandemic." *Id.* at 21-22. Thus, according to the government, "[t]here can be little doubt that the parties and the Court were aware of the likelihood of risk of transmission and especially restrictive conditions until the viral spread could be under some control." *Id.* at 22.

## A. Exhaustion

As a threshold issue, it is plain that defendant has exhausted his administrative remedies. As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the

defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  Once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *See*, *e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

As noted, on January 8, 2021, defendant submitted a petition for compassionate release to the Warden at FCI Cumberland.  ECF 35-1 at 3.  After thirty days passed, on February 8, 2021, defendant submitted the Motion to this Court.  ECF 32.  The Warden then denied defendant's motion on February 16, 2021.  ECF 35-1 at 4.  In light of the foregoing, defendant properly exhausted his administrative remedies.

### B.  Extraordinary and Compelling Circumstance

I next consider whether defendant has demonstrated an extraordinary and compelling reason for his release, within the meaning of 18 U.S.C. § 3582(c)(1)(A).  As mentioned, the Motion is predicated on defendant's vulnerability to COVID-19.  ECF 32 at 1-2.  However, Mr. Mitchell, who is now 31 years of age, has failed to identify any underlying medical condition that would elevate the risk posed to him by COVID-19.

Notably, the government has provided the Court with copies of defendant's medical records.  ECF 39-2; ECF 39-3.  They indicate that defendant is 5'9" tall and, as of February 11, 2021, he weighed 175.8 pounds.  *See* ECF 39-2 at 18 (height); ECF 39-3 at 2 (weight).  Thus, the most up-to-date information made available to the Court reflects that defendant has a BMI of 25.8, which, according to the CDC, renders him overweight.  *See Adult BMI Calculator*, CTRS. FOR

DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult bmi/english bmi calculator/bmi calculator.html (last accessed June 7, 2022). And, the CDC has warned that being overweight is among the conditions that "can make you more likely to get very sick from COVID-19." *Certain Medical Conditions, supra*.

But, a number of courts have declined to find that being overweight, on its own, serves as a sufficiently serious condition to qualify as an extraordinary and compelling circumstance, even when considering defendants with BMIs similar or greater than Mr. Mitchell's. *See*, *e.g.*, *United States v. Waugh-Hixon*, PWG-19-137, 2021 WL 4750713, at *3 (D. Md. Oct. 21, 2021) (BMI of 30); *see also United States v. Jones*, RDB-10-232, 2021 WL 2805947, at *3 (D. Md. July 6, 2021) ("Several district courts have held that obesity is not individually sufficient for a finding that there are circumstances akin to the 'extraordinary and compelling reasons' which justify compassionate release."); *United States v. Moore*, Crim. No. 18-474, 2021 WL 308331, at *2 (E.D. Penn. Jan. 29, 2021) (finding that defendant's "slightly elevated BMI of 25 does not justify his release," and noting that "Courts have consistently denied compassionate release to inmates with significantly higher BMI levels"); *United States v. Carter*, PWG-17-0529, 2021 WL 307417, at *3 (D. Md. Jan. 29, 2021) (noting "multiple cases denying compassionate release to defendants with obesity *and* a preexisting condition that increased defendants' risk of severe illness"); *United States v. Peaks*, No. 16-20460, 2020 WL 2214231 (E.D. Mich. May 7, 2020) (inmate with BMI of 44 and hypertension does not meet test for extraordinary and compelling circumstances).

Additionally, it is significant that defendant is relatively young. And, there are no other medical conditions that have been mentioned.

Moreover, at least as of April 2021, defendant refused to be vaccinated against COVID-19.  ECF 39-3 at 8.  As Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months."  *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *accord United States v. Chinji*, PWG-19-0243, 2022 WL 2209106, at *4 (D. Md. June 21, 2022); *United States v. Manon*, Crim. No. 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022); *United States v. Carter*, 3:19-cr-356, 2022 WL 272196, at *2-3 (N.D. Ohio Jan. 28, 2022); *United States v. Culp*, 92-cr-81058, 2021 WL 5834312, at *2 (E.D. Mich. Dec. 9, 2021); *United States v. Hignight*, 4:14-CR-129(4), 2021 WL 5299249, at *6 (E.D. Tex. Nov. 12, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021).

In sum, Mr. Mitchell appears to be in relatively good health.  Moreover, his refusal to obtain the COVID-19 vaccine substantially undermines his claim that his alleged vulnerability to the virus amounts to an extraordinary and compelling reason that warrants his release from prison.  Thus, given the circumstances present here, the Motion fails.  However, out of an abundance of caution, I will conduct an analysis of the § 3553(a) factors.

### C.  Application of Section 3553(a) Factors

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is only warranted under 18 U.S.C. § 3582(c)(1)(A) if appropriate in light of the factors set

26

forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186.  The § 3553(a) factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; and (4) any pertinent Sentencing Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims

Turning to the severity of the instant offense, the unlawful possession of firearm by a prohibited person is undoubtedly serious.  *See* ECF 14 at 10.  Mr. Mitchell's decision to carry a loaded firearm on a public street created a substantial risk of harm to those around him.

Moreover, Mr. Mitchell's criminal history remains of concern to the Court.  *See* ECF 29, ¶¶ 27-29.  As illustrated above, defendant has previously been convicted of drug-related offenses on three separate occasions between June 2009 and February 2012.  *Id.*  Notably, the relatively lenient sentences that followed those convictions have proven to be insufficient to deter defendant from engaging in criminal conduct.   In fact, Mr. Mitchell committed the instant offense while he was on parole.  *Id.* ¶¶ 27, 29.   And, BOP records specify that, as of September 14, 2020, defendant was considered to have a high risk of recidivating.   *See* ECF 39 at 2.[10]

In *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court acknowledged that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's]

---

[10] On July 19, 2019, the Department of Justice released a risk assessment tool, known as PATTERN, as required by 18 U.S.C. § 3632(a). *The Attorney General's First Step Act Section 3634 Annual Report*, OFF. OF THE ATT'Y GENERAL, DEP'T OF JUSTICE, https://bit.ly/3EDlDhc (December 2020), 4. Among other things, PATTERN was designed to evaluate "the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism," as well as to "reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison." 18 U.S.C. §§ 3632(a)(1), (4).

'history and characteristics.'" (Quoting 18 U.S.C. § 3553(a)(1)).  And, the Court is encouraged by BOP records which indicate that defendant enrolled in a GED program while incarcerated.  ECF 39 at 2.  But, the Court has not been provided with further information pertaining to the current state of defendant's post-release plans or his efforts to rehabilitate himself while imprisoned, such as his disciplinary record.  In any event, as mentioned, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at * 1.

Mr. Mitchell has served approximately 68.5% of the sentence the Court initially imposed. *See* ECF 27 at 2.  This sentence had been agreed to by the parties (ECF 21 at 1), and it was 16 months below the bottom of the Guidelines range.  ECF 29, ¶ 78.  As I see it, defendant's premature release would not adequately reflect the seriousness of his criminal conduct nor afford adequate protection to the community.

I am mindful that in advance of sentencing, many members of Mr. Mitchell's family submitted letters on his behalf, which made clear that defendant enjoys support in the community. *See* ECF 21-1 through ECF 21-5.  This support will undoubtedly assist Mr. Mitchell in his transition to society and hopefully reduce the likelihood that defendant will reoffend or otherwise endanger the public.  But, the support does not override the Court's concerns, as set forth above.

In sum, a balancing of the sentencing factors set forth in 18 U.S.C. § 3553(a) weighs against awarding defendant the relief he seeks at this time.

### V. Conclusion

In light of the foregoing, I shall deny the Motion, without prejudice to defendant's right to file a renewed motion for compassionate release.

An Order follows, consistent with this Memorandum Opinion.


Date: July 21, 2022                              _____/s/_____

                                                Ellen L.  Hollander
                                                United States District Judge